IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SHAYD CHARLES MITCHELL,

                    Plaintiff,

        v.                                                          OPINION and ORDER

BRUCE MEYER, JON OURADA,                                            18-cv-311-jdp
PAUL WESTERHAUS, BRUCE SUNDE,
MARK BYE, and MATT THEILER,

                    Defendants.

Plaintiff Shayd Charles Mitchell, appearing pro se, is a prisoner at Redgranite Correctional Institution. This case is about Mitchell's previous detention at Lincoln Hills School. Mitchell alleges that defendant Bruce Meyer, a youth counselor at Lincoln Hills, sexually assaulted him several times and that defendant Lincoln Hills staff members enforced the lax security regulations that made it possible for the assault to occur. He also alleges that defendants enforced other regulations that violated his right to communicate with others outside the facility and that discriminated against him because he is gay. Defendants have filed a motion for summary judgment. Dkt. 51. I will grant that motion in all respects except for Mitchell's claims directly against Meyer for sexually assaulting him. Because there is a genuine dispute of material fact about whether Meyer sexually assaulted Mitchell, that claim will proceed to trial.

PRELIMINARY MATTER

Before I address defendants' motion for summary judgment, I will address a motion to compel discovery filed by Mitchell. Dkt. 37. In his motion, Mitchell objected to several of

defendants' repeated responses to many of his requests, such as stating that defendants were still working on gathering documents and citing attorney-client privilege or the work-product doctrine. Defendants also redacted information from an investigation of Mitchell's sexual-assault allegations. But Mitchell didn't give a detailed explanation of his problems with defendants' responses until his reply brief. The court gave defendants a chance to respond to the arguments that Mitchell made in his reply and to explain whether they had sent Mitchell the rest of the materials, which they said that they had still been compiling. Dkt. 62, at 2.

Defendants responded that they had sent the remainder of materials to Mitchell. Dkt. 63. Mitchell's summary judgment materials include those documents and he doesn't raise objections to those materials. Mitchell hasn't articulated why he believes that defendants have wrongly invoked attorney-client privilege or the work-product doctrine for any of their responses. He objects to defendants raising multiple objections to individual requests, but many of his requests are quite broad (for instance, Mitchell asked Meyer to "[i]dentify . . . any and all materials you used or relied upon in preparation of answering any of the plaintiff's interrogatories," Dkt. 44-3, at 9) so defendants responded with their own broad objections to any part of those materials that would be protected, while they continued to work on compiling their responsive materials. But Mitchell doesn't object to the materials that he eventually received. So I'll deny this portion of the motion to compel.

The one discovery issue Mitchell does discuss in detail is about investigatory materials produced by the DOC after Mitchell alleged that he and another Lincoln Hills detainee were sexually assaulted by defendant Meyer. Defendants produced a version of those materials redacting the names of several people who were then youths at Lincoln Hills. *See* Dkt. 58-2. Defendants cite Federal Rule of Civil Procedure 5.2 ("Privacy Protection For Filings Made with

the Court") in support of their decision redact those names, which isn't a valid basis for redacting discovery materials provided directly to an opponent. Nonetheless, the redactions didn't prejudice Mitchell: the main name redacted throughout is an inmate identified by defendants as "A.B." but Mitchell already knows this person's name. A.B. denied being assaulted and he stated that he was unaware of anyone else being assaulted either. *See* Dkt. 58-2, at 12. The other names redacted are former Lincoln Hills detainees mentioned in passing by A.B. in his interview but not in a way that suggests that any of them were involved in an incident relevant to this lawsuit. So I'll deny this portion of the motion to compel as well.

Next, I turn to defendants' motion for summary judgment.

## FACTUAL BACKGROUND

The general outline is undisputed; I'll identify the main factual disputes.

Plaintiff Shayd Charles Mitchell is currently incarcerated at Redgranite Correctional Institution, but the events relevant to this case took place while Mitchell was a detainee at Lincoln Hills School, the Wisconsin Department of Corrections' facility for juvenile boys. Mitchell was detained at Lincoln Hills for much of the time from December 2004 to March 2012. Mitchell was born in 1990, so he was a minor for part of this time. I take Mitchell to be saying that he was released from Lincoln Hills for parts of this eight-year period and he was returned there after being sanctioned by the state court as part of the state's serious juvenile offender program.

Each of the defendants worked at Lincoln Hills: Mark Bye was a unit manager, Bruce Meyer was a youth counselor, John Ourada was the deputy superintendent, Bruce Sunde was

a youth security director, Matt Theiler was a corrections unit supervisor, and Paul Westerhaus was a correctional services manager.

Mitchell spent most of his time at Lincoln Hills in King Cottage, where the Sex Offender Treatment Program (SOTP) living unit was located. Each detainee at King Cottage, including Mitchell, had been adjudicated delinquent for a sex crime.

## A. Sexual assault

The Lincoln Hills living areas had surveillance video cameras that were monitored 24 hours a day. But Mitchell says that there were gaps in the coverage of those cameras, particularly in unit hallways and in the detainees' individual rooms. Mitchell also says that he could on occasion see the control booth's video feeds, which often were blank—he assumes that this means the recording equipment often malfunctioned. In 2007, defendant Bye requested more cameras; the parties do not explain if that request was granted.

Mitchell also says that staffing was inadequate—only one staff member was in the unit on third shift. Eventually, a new policy stated that each unit would be patrolled by an additional staffer at least once every two hours. But this still meant that there were periods of time when only single staff member was present in a unit.

Mitchell says that sometime in spring 2005, Meyer used his keys to enter Mitchell's room after unit lockdown. Mitchell was about to ask Meyer what was happening when Meyer attacked him. Meyer used his weight to pin Mitchell down, pull down his pants and underwear, and rape him.

Mitchell says that Meyer raped him a total of five or six times during his various stays at Lincoln Hills, although he doesn't explain each incident in detail to say when they happened. He says that Meyer put sedatives in his bedtime snacks and he doesn't remember all the details

4

of events because he was unconscious for at least some of the attacks. He remembers one incident in which he woke up while Meyer was raping him, and Meyer punched him in the head, knocking him out. In another incident he was drugged to the point of being conscious but was incapacitated other than being able to plead for Meyer to stop.

Mitchell says that in March 2012, Meyer raped Mitchell again. Mitchell says that the attack started while he was asleep, and he woke up when Meyer covered his mouth with a "rag which had a pungent smell and knocked [him] out right away." Dkt. 14, at 14, ¶ 35. Mitchell says that he woke up the next day "feeling sore and violated." *Id.*

Meyer denies assaulting Mitchell.

## B.  Mitchell's grievances and PREA complaint

Mitchell says that Lincoln Hills staff would not provide detainees with the correct complaint forms, and those that were completed would not end up in the hands of the correct reviewing official; he says that grievances were diverted to a cabinet in the basement of the records building, but he doesn't say how he knows that this occurred. When Mitchell had his orientation at Lincoln Hills, a video showing new detainees the procedure for how to file grievances "was fast forward[ed] through and stopped at random points which caused an unintelligible sequence of events that [Mitchell] was unable to understand." Dkt. 68, at 21, ¶ 201. Mitchell says that this made it "impossible" for detainees to pursue grievances about problems at the facility, although he goes on to discuss three grievances that he indeed filed and that are recorded in the Lincoln Hills grievance log. These grievances were all about defendant Meyer, but none of them were about Meyer sexually assaulting Mitchell. In April 2010, Mitchell complained that Meyer made offensive comments about Mitchell's sexual

orientation (Mitchell is gay). Mitchell says that defendant Theiler told Meyer to "clear the air" with Mitchell.

In September 2010, Mitchell filed a grievance for Meyer unfairly disciplining him as harassment for being gay. Mitchell says that defendant Theiler told Meyer that Meyer's behavior was unacceptable. When Mitchell returned to the unit, another detainee told Mitchell that Meyer had made a comment about a rainbow hovering over the cottage in which Mitchell was being held on a rules violation; Mitchell took Meyer to be referring to a "gay pride" rainbow. Mitchell confronted Meyer about the comment and the ongoing verbal harassment, and Meyer told him that he needed to grow thicker skin because not everyone in life would be nice to him. At the end of the conversation Meyer said, "You are still a fucking fairy so fly back to your room and shrug it off." *Id.* at 22, ¶ 214.

In December 2010, Mitchell filed a grievance against Meyer for telling a counselor to stop letting Mitchell out of his room to play chess. Mitchell believes that this was part of Meyer's pattern of harassment against him for being gay. Mitchell says that he asked defendant Theiler to move him to a different cottage, but Theiler did not move him. Mitchell said that this grievance was "discussed" with defendants Ourada, Westerhaus, and Sunde.

In December 2017, Mitchell notified officials about being assaulted by Meyer. He also alleged that he witnessed Meyer assault A.B. in 2010 or 2011. The DOC performed an investigation under its Prison Rape Elimination Act (PREA) procedures, interviewing Mitchell, A.B., and Meyer. A.B. denied being assaulted by Meyer. The investigator concluded that Mitchell's allegations were not credible because of A.B.'s testimony and the lack of evidence corroborating Mitchell's version of events. The DOC's formal conclusion was that Mitchell's allegations were unsubstantiated.

Mitchell says that, in addition to the formal complaints about harassment and sexual assault, Meyer was disciplined for viewing pornography on a work computer, although Mitchell does not explain how he knows that.

## C.  PREA training

All of the defendants except Bye (who retired in 2007) completed the National Institute of Corrections' PREA training course between 2006 and 2010. Mitchell attempts to dispute this by noting that in their admissions, some of defendants denied being "made aware of the common reactions of sexual abuse and sexual harassment victims through PREA training." *See, e.g.*, Dkt. 67, at 6, ¶ 22. But the only reasonable inference from defendants' statements, viewed in context, is that they were saying that they did not learn this particular skill during the PREA training that they completed. Mitchell does not provide any evidence contradicting defendants' own accounts of what they learned in PREA training, nor does he point to any evidence showing that they did not receive this training. Mitchell's proposed findings about Lincoln Hills failing to ensure that staff received PREA training are unsupported, and I will not consider them.

## D.  Mitchell's discipline

In 2005, Mitchell received a conduct report for inappropriate sexual conduct: he was accused of engaging in sexual talk and gestures with another detainee. He received a conduct report for sexual contact in 2007: he was accused of touching another detainee on the buttocks with his hand. In 2010 he received a conduct report for failure to cooperate with treatment: he was accused of making eye contact in a sexual manner with another detainee during programming. In 2010, he received another conduct report for sexual conduct: he was accused of soliciting a youth to masturbate while he watched, in exchange for canteen purchases.

### E.  Unit restrictions

The SOTP unit used a series of measures to prevent detainees from acting out in a sexual manner toward each other. For instance, the unit was declared a "no-touch" unit, meaning that detainees could not touch each other. Upon arriving at the SOTP unit, a detainee would be observed for some time before being allowed to shower at the same time as other detainees on the living unit or shower together in the gymnasium locker room after physical education. This was known as a "shower together" designation.

Mitchell says that when unit staff met weekly to discuss the detainees' progress and treatment, they could decide to implement designations segregating a detainee in certain respects. A detainee could be given a "shower alone" restriction if the staff though that a detainee was exhibiting behaviors suggesting that he would act out sexually. For similar reasons, staff could place the detainee on "bathroom alone," "hallway alone," "staff escort only," or "special programming" designations. A "bathroom alone" designation meant that the detainee would not be allowed in the bathroom area with other detainees and that staff would closely monitor the detainee while he was in the bathroom area. A "hallway alone" designation meant that a detainee would not be allowed inside the hallway of the SOTP unit until all other detainees were secured inside the rooms assigned to them, and staff would closely monitor the detainee. A "staff escort only" designation meant that a detainee would be held back from a group movement of detainees until all other detainees were at the intended location, and then staff would escort the single detainee to that location. A "special programming" designation meant that a detainee would have to sit in a standalone desk away from all other detainees while outside of his room; the detainee would have to eat meals, watch television, do homework, and wait for movements to another location by himself. Mitchell believes that these

8

designations were used to shame detainees who "act[ed] out sexually in a homosexual manner." Dkt. 68, at 15, ¶ 150.

In 2005, Mitchell was given a "bathroom alone" designation after his conduct report for inappropriate sexual conduct. In 2010, Mitchell was given "bathroom alone" and "shower alone" designations following a conduct report for sexual misconduct. He says that Meyer "vehemently" supported the "bathroom alone" and "shower alone" designations and that he advocated for a "special programming" designation, but Mitchell was not given that designation.

Mitchell says that the final step of preventative measures used by the SOTP unit staff was something called the "red shirt program," a step used after a detainee "had *actually* acted out in a homosexual manner." *Id.* at 19, ¶ 184 (emphasis in original). A detainee given this designation would have to wear a red sweater everywhere he went, including out of the cottage or on visits. Defendants call this program "an identification program for kids that may have been involved in sexual behaviors on grounds or have specific 'risk behaviors,'" Dkt. 68-1, at 3, an "identification program to keep youth sexual offenders from interacting with each other." Dkt. 68-9, at 2, and a program for "certain youth who had been deemed to be sexually aggressive towards other youth and required constant staff supervision." Dkt. 68-11, at 3.

In 2006, Mitchell was directed to wear a red sweater while being transferred to Ethan Allen School for Boys following an incident of sexual contact. Mitchell says that the various segregation statuses and the red shirt program "shamed and humiliated [detainees] plus made [him] feel like reporting homosexual activity was wrong." Dkt. 14, at 18, ¶ 184.

**F.  Communications outside the facility**

Staff read Mitchell's incoming and outgoing mail and allowed him to contact only people on his pre-approved list. At the start of his time at Lincoln Hills, communications were limited to his parents and siblings. If he received mail from someone who was not on the approved contact list, the mail would be returned to the sender marked refused. He wasn't notified when such a rejection occurred. Similarly, Mitchell was allowed to make telephone calls only to people on his approved contact list, and those phone calls were monitored by staff. Staff didn't tell Mitchell how to add people to his approved contact list. Through the intervention of his mother, a social worker, and a chaplain, Mitchell's grandmother and mentor were eventually added to the list.

Defendant Meyer disciplined Mitchell twice for misusing the phone: once when his mother put a sibling on the phone when he was not supposed to have contact with that sibling, and once when Meyer thought that Mitchell was cursing too much on the call. In 2010, Meyer intercepted delivery of *Parenting* magazine to Mitchell because he thought that it would "trigger" Mitchell and he referred the issue to a staff psychologist. Later the magazine subscription expired without being renewed.

Mitchell says that staff dissuaded or stopped detainees from using the law library; he says that he was not allowed inside the law library, and that at one point defendant Meyer disciplined him for going to the law library when a social worker took him there.

ANALYSIS

Mitchell brings claims against defendants for restricting his mail and telephone calls, discriminating against him for being gay, and humiliating him with the "red shirt" program.

10

He also alleges that defendant Meyer sexually assaulted him and that the other defendants failed to protect him from those assaults and generally did not take the risk of assault seriously.

## A.  First Amendment right to communicate by mail and phone

I granted Mitchell leave to proceed with First Amendment censorship claims against defendants for adopting policies under which Lincoln Hills staff monitored and blocked phone calls and mail. In the prison context, inmates retain some First Amendment right to send and receive mail and to make telephone calls. Censorship of an inmate's outgoing mail does not violate the First Amendment if it (1) furthers an "important or substantial governmental interest unrelated to the suppression of expression" and (2) is "'no greater than is necessary or essential to the protection' of that interest." *Koutnik v. Brown*, 456 F.3d 777, 784 (7th Cir. 2006) (quoting *Procunier v. Martinez*, 416 U.S. 396, 413 (1974)). Similarly, unreasonable restrictions on a prisoner's telephone access may violate the Constitution. *Tucker v. Randall*, 948 F.2d 388, 391 (7th Cir. 1991). Mitchell's rights as a detainee under a juvenile-court order are at least as extensive as those governing convicted prisoners, although I note that juvenile-detention staffers may have different governmental interests in imposing communications restrictions than officials at adult prisons.

Defendants raise two defenses to these claims, both of which I agree are reasons to dismiss Mitchell's claims. First, they contend that prison staff monitored and limited Mitchell's communications in accordance with DOC regulations, which would entitle them to qualified immunity. Wisconsin Administrative Code § DOC 379.04 ("Mail") directs staff at juvenile correctional facilities to limit mail contact to a list of a detainee's approved mail contacts and allows staff to open and read incoming and outgoing mail. Section DOC 379.21 ("Telephone

calls") directs staff to limit phone calls to close family members or approved contacts and allows staff to monitor phone calls.

Generally speaking, government officials are entitled to enforce duly enacted laws without independently evaluating their constitutionality. "The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979). The Court of Appeals for the Seventh Circuit has applied the *DeFillippo* holding to conclude that the doctrine of qualified immunity applied to governmental defendants. *See Doe v. Heck*, 327 F.3d 492, 515–16 (7th Cir. 2003) (holding that although the statute authorizing child-welfare caseworkers to find, seize, and interview suspected abused children without a warrant and without a parent's consent was unconstitutional, the caseworkers were entitled to qualified immunity from the Fourth Amendment violation because they acted pursuant to a lawful statute; the statute was not "so patently unconstitutional as to deny the defendants qualified immunity").

Government officials are entitled to qualified immunity from personal liability in a lawsuit unless their conduct violated a federal statutory or constitutional right and the unlawfulness of their conduct was "clearly established at the time." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018). Mitchell has the burden of demonstrating that defendants' violation of the First Amendment was "clearly established." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). Mitchell can show that the violation was clearly established if "a violation of this right has been found in factually similar case, or that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of

12

a factually similar case." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). Mitchell doesn't cite any controlling authority discussing the scope of First Amendment communication rights in similar cases by detainees in juvenile facilities, and I am not aware of any such authority. This and other courts have applied *DeFillippo* to officials enforcing administrative code provisions. *See, e.g.*, *Salvia v. Fell*, No. 14-cv-237-wmc, 2016 WL 1274620, at *11 (W.D. Wis. Mar. 31, 2016) (police have qualified immunity for enforcing administrative rules requiring a permit for public events at state capitol); *Cantrell v. Rumman*, No. 04 C 3041, 2005 WL 1126551, at *15 (N.D. Ill. Feb. 9, 2005) (officials have qualified immunity for enforcing regulations limiting speech on government property).

I conclude that the mail and phone regulations at issue are not grossly unconstitutional such that it would be obvious to staff that they were violating Mitchell's rights by following the regulations. So I conclude that defendants are entitled to qualified immunity with regard to any actions they took following the DOC regulations.

Mitchell seems to agree, at least about the mail-monitoring rules, because he says that he "[is] not claiming that constitutional rights were violated because staff actively monitored mail." Dkt. 66, at 24. Instead, Mitchell says that defendants "abused" the regulations. *Id.* He states that staff misled him about how to get more contacts approved and failed to tell him when unapproved mail was sent back to a sender. He mentions some incidents in which Meyer

13

blocked communications, and he suggests that had he attempted to contact outside parties—even approved contacts like his parents—officials would have blocked those phone calls or letters.

Almost all of these claims fail because of defendants' second argument: Mitchell fails to show that any of the defendants were personally involved in the deprivations at issue. *See Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 615 (7th Cir. 2002) (plaintiff must show that the defendant was personally involved in harming plaintiff; plaintiff cannot succeed on a constitutional claim against supervisor based merely on misdeeds of supervisor's employees). So even if Lincoln Hills staff blocked Mitchell's communications by doing something not allowed under the DOC regulations, Mitchell still needs to explain how one of the named defendants was involved in that action. Mitchell mostly fails to do so.

The exception is that Mitchell says that Meyer disciplined him for misusing the phone by talking to a sibling with whom he was not supposed to have contact, and by cursing too much on one call. But Mitchell does not provide enough facts to make clear whether Meyer followed or violated DOC policies by disciplining him. Mitchell appears to concede that he was not allowed to contact his sibling. And Mitchell doesn't provide any context to his statement about the phone call in which he was cursing, so I can't tell whether Meyer's actions were warranted.  Mitchell doesn't specifically say what he said or what rule Meyer accused him of breaking. At summary judgment, Mitchell has the burden to provide facts that could lead a reasonable jury to conclude that Meyer violated his First Amendment rights. He's failed to do so with regard to his claims that Meyer abused his rights to use the phone.

Mitchell also says that Meyer intercepted a copy of *Parenting* magazine and that the magazine subscription was allowed to expire. But I did not allow Mitchell leave to proceed on

a claim about the right to receive periodicals, and in any event, Mitchell does not explain whether it was Meyer's or any other defendants' fault that the subscription expired.

## B. Equal protection

I granted Mitchell leave to proceed on claims that defendants violated the Equal Protection Clause of the Fourteenth Amendment by treating him differently from other detainees because he was openly gay. To succeed on this type of a claim, a plaintiff must show that he "is a member of a protected class," that he "is otherwise similarly situated to members of the unprotected class," and that he "was treated differently from members of the unprotected class." *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993) (quoting *McMillian v. Svetanoff*, 878 F.2d 186, 189 (7th Cir. 1989)).

Mitchell alleges that Meyer verbally harassed him for being gay, but generally, verbal harassment or rude comments by prison staff alone does not violate the Constitution. *See DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000). And I do not take Mitchell to be saying that Meyer sexually assaulted him because he is gay. Instead, Mitchell focuses on the policies Lincoln Hills staff used to prevent detainees from acting out in a sexual manner toward other detainees.

He says that protocols like shower-alone, bathroom-alone, hallway-alone, and staff-escort statuses and the red shirt program were meant to stigmatize gay detainees, but he doesn't present any evidence that the policies were put in place specifically to punish sexual contact with other boys rather than sexual activity of any type. Nor does he present any evidence that he was placed in any of those statuses or in the red shirt program because he was gay.

It's important to note that Lincoln Hills staff are tasked with keeping youths safe and with providing treatment to boys who have committed sex offenses. They have legitimate

interests in barring sexual contact between youths and in preventing youths from receiving unwanted sexual advances, even more so when dealing with youths living alongside majority-age detainees, like Mitchell was for part of his time there. This court must accord some deference to Lincoln Hills staff in pursuing policies aimed at maintaining a safe facility. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) ("A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979))).

The facility's preventative measures are directed to sexual contact of any kind. As Mitchell notes, these rules affected only same-sex activity because only male detainees are housed at Lincoln Hills. The blanket prohibition on sexual contact is not discriminatory simply because it can be applied only to males. Mitchell has adduced no evidence that the ban on sexual contact was enforced only against gay detainees but not against heterosexuals. Mitchell has failed to meet his burden to show that defendants discriminated against him based on his sexual orientation. I will grant their motion for summary judgment on these claims.

## C. Infliction of humiliation

Mitchell states that defendants implemented the "red shirt program" disciplining detainees involved in homosexual activity by forcing them to wear red shirts. I granted him leave to proceed on a claim that defendants unnecessarily humiliated him by doing so. Prison or jail officials may not undertake security measures "conducted in a harassing manner intended to humiliate and cause psychological pain." *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009).

In screening Mitchell's claims, I noted that the precise legal standard applying to these claims and his other claims that would usually be brought under the Eighth Amendment was unsettled because of Mitchell's status as a juvenile detainee. Dkt. 16, at 3. Precedent is not clear about whether claims concerning the conditions of confinement in a juvenile facility should be considered under the Eighth Amendment's Cruel and Unusual Punishment Clause or the Fourteenth Amendment's Due Process Clause. *See Reed v. Palmer*, 906 F.3d 540, 549 (7th Cir. 2018) (stating that the correct standard to apply to juvenile cases remains unclear and noting that the United States Supreme Court has avoided answering the question). Rather than the Eighth Amendment's prohibition on cruel and unusual punishment for convicted prisoners, the Fourteenth Amendment prohibits any type of punishment against pretrial detainees. *See Youngberg v. Romeo*, 457 U.S. 307, 320 (1982); *Bell*, 441 U.S. at 535.

Under the Eighth Amendment, a convicted prisoner generally needs to show that the defendant intentionally harmed him or acted with deliberate indifference toward a risk of harm to him. But pretrial detainees (who are not convicted prisoners) need not prove the defendant's subjective state of mind to prove a claim under the Fourteenth Amendment; they need show only that the defendant's actions were "objectively unreasonable." *Kingsley*, 576 U.S. at 396–400 (discussing an excessive force claim); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (expanding *Kingsley's* rationale to medical care claims). I recently concluded in another case that the Fourteenth Amendment was the correct standard to apply to juveniles because their adjudications are not criminal in nature. *See Apkarian v. McAllister*, No. 17-cv-309-jdp, 2019 WL 4256826, at *4 (W.D. Wis. Sept. 9, 2019). So I will apply the Fourteenth Amendment "objectively unreasonable" standard here.

17

To succeed on a claim under the Fourteenth Amendment, Mitchell must still show that that the defendants acted "with purposeful, knowing, or reckless disregard of the consequences" of their actions. *Miranda*, 900 F.3d at 354. It is not enough to show that they acted out of negligence or even gross negligence. *See Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (citing *McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir. 2018)). Mitchell must also show that defendants' actions were objectively unreasonable. *Miranda*, 900 F.3d at 354. This determination is made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. In terms of claims about implementation of security measures, this means that Mitchell must show that the security measure is not rationally related to a legitimate governmental purpose or at least exceeds the need to serve a legitimate purpose. *Id.* at 398. If so, the measure is a form of punishment, which violates the Fourteenth Amendment. *Bell*, 441 U.S. at 539.

Mitchell contends that the red sweaters were intended to humiliate gay detainees, but as explained, he has no evidence that detainees were forced to wear red sweaters because of their sexual orientation.  There's no question that Lincoln Hills staff have a legitimate interest in curbing sexual activity among youths at the facility, and defendants say that the policy was meant to identity youths who were a high risk of engaging in sexual activity.  But they do not explain the implementation the program in any detail. Neither does Mitchell explain how the red shirt program worked or his experiences with it, but he does say that he was humiliated by having to wear the red sweater. But even if I concluded that a reasonable jury could decide that the ostracizing effect of forcing detainees to wear a special shirt was excessive in relation to staff's security rationale in using the shirts, defendants are entitled to qualified immunity. Mitchell doesn't cite any controlling authority discussing either the Eighth or Fourteenth

Amendment infliction-of-humiliation standards regarding the use of clothes or other items to single out detainees, and I am not aware of any such authority. So I conclude that qualified immunity applies to Mitchell's infliction-of-humiliation claims.

## D. Sexual assault

Mitchell alleges that defendant Meyer raped him several times. Meyer denies assaulting Mitchell, and defendants argue that Mitchell has failed to provide evidence supporting his allegations. In particular, they say that each living area had cameras that were monitored 24 hours a day, and that "there were also room cameras." Dkt. 68-1, at 3. I take defendants to be saying that this means that the cameras would have picked up Meyer's attacks and that there is in fact no recording of any of those attacks. But they do not cite any evidence that they combed through the recordings to confirm this or even that they still have the recordings that would disprove Mitchell's claims.

Defendants argue that Mitchell's claims are "unsupported and not corroborated by any other evidence, aside from Plaintiff's own vague allegations." Dkt. 69, at 7. But Mitchell doesn't need anything more than his own firsthand account of the assaults to create a genuine dispute of material fact. His amended complaint, Dkt. 14, includes a statement that he swears to the contents under penalty of perjury, making that complaint a "verified complaint" that is the equivalent of a declaration for purposes of summary judgment. *See, e.g.*, *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017). He also includes some detail of the assaults in his separate affidavit supporting his response to defendants' summary judgment motion. Dkt. 68. He disputes that there were cameras in each of the rooms he slept in. But even aside from the question of whether the rooms had cameras, he provides a firsthand account of being repeatedly sexually assaulted by Meyer. That's enough to create a genuine dispute of material fact.

Defendants also argue that because the DOC investigated Mitchell's allegations that Meyer assaulted Mitchell and A.B. and did not find any wrongdoing on Meyer's part, Mitchell's claims "should not be re-litigated here." Dkt. 52, at 6. The evidence derived from that litigation might weaken Mitchell's case, if it is admissible here.  But the DOC's decision has no preclusive effect on this litigation, so that's not a reason to grant summary judgment. I will deny defendants' motion for summary judgment on the Fourteenth Amendment sexual-assault claims against Meyer, and those claims will proceed to trial.

## E.  Failure to protect

Mitchell brings claims against the other defendants, all of whom were supervisory officials, for their roles in failing to protect him from sexual assault. He contends that policies developed or carried out by the officials increased the danger of sexual assault and made it difficult for him to speak out against assaults.

I take Mitchell to be saying that there are two ways in which defendants failed to protect him.  The first is that defendants failed to heed warnings of the dangers posed by Meyer. The second is that defendants generally failed to take sexual-assault safety seriously at the facility.

In the Eighth Amendment prisoner context, a plaintiff must show that he faces a substantial risk of serious harm, and that the defendants knew of and disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994); *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010). A generalized risk of violence is not enough, because detention facilities are inherently dangerous places where risk cannot be completely eliminated. *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005); *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). A substantial risk of serious harm is one in which the risk is "so great" that it is "almost certain to materialize if nothing is done." *Id.* at 911.

20

Under *Kingsley* and *Miranda*, Mitchell doesn't need to prove defendants' deliberate indifference to the risk of harm. He needs only to show that they acted objectively unreasonably. But those cases did not eliminate the need to consider the facts known to the defendants at the time they made decisions, or the state of mind with which they performed certain actions:

> We consider a legally requisite state of mind. In a case like this one, there are, in a sense, two separate state-of-mind questions. The first concerns the defendant's state of mind with respect to his physical acts—i.e., his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns the defendant's state of mind with respect to whether his use of force was "excessive." Here, as to the first question, there is no dispute. As to the second, whether to interpret the defendant's physical acts in the world as involving force that was "excessive," there is a dispute. We conclude with respect to that question that the relevant standard is objective not subjective.

*Kingsley*, 576 U.S. at 395. In *Kingsley*, an excessive force case, it was clear that the defendants performing a cell extraction knew that they were being physically violent toward the inmate; that is, they intentionally undertook their actions to subdue the plaintiff. In extending *Kingsley* to medical care cases, the *Miranda* court concluded that the plaintiff must show that the defendant medical staff acted purposefully, knowingly, or recklessly—not merely negligently— "when they considered the consequences of their handling of the [detainee's] case." 900 F.3d at 353. Other district courts of the circuit have adapted *Kingsley* to conditions-of-confinement cases by concluding that the plaintiff must show that a defendant "'knew, or should have known, that the condition posed an excessive risk to health or safety'" and "'failed to act with reasonable care to mitigate the risk.'" *Norris v. Downs*, No. 19-CV-3251-MMM, 2020 WL 3513694, at *1 (C.D. Ill. June 29, 2020) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *McFarthing v. Colone*, No. 19 C 0777, 2020 WL 3250740, at *5 (N.D. Ill. June 16,

2020) (also citing *Darnell*). And the objective reasonableness standard must still be applied in light of what the officer knew at the time. *Kingsley*, 576 U.S. at 397.

Here, for both claims regarding danger posed specifically by Meyer or the claims about the general danger of sexual assault at Lincoln Hills, Mitchell fails to show that defendants were aware a *substantial* risk of serious harm. I'll start with Mitchell's claim about Meyer. An often-cited theoretical example of what constitutes a substantial risk under *Brown* is if officials knew, or suspected to a high probability, that a detainee had been placed in a cell with a cobra. *Brown*, 398 F.3d at 911 (quoting *Billman v. Ind. Dept. of Corr.*, 56 F.3d 785, 788 (7th Cir. 1995)). Courts handling failure-to-protect cases "also have in mind risks attributable to detainees with known 'propensities' of violence toward a particular individual or class of individuals; to 'highly probable' attacks; . . . to particular detainees who pose a 'heightened risk of assault to the plaintiff,'" *id.*, and to "known hazard[s] where prison officials fail to protect an inmate who belongs to an identifiable group of prisoners for whom the risk of assault is a serious problem of substantial dimensions," *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) (internal quotation omitted).

To defeat summary judgment, Mitchell must present facts that could lead a reasonable jury to find that defendants knew that Meyer posed this sort of clear threat. Mitchell alleges that defendants had reasons to suspect Meyer of being a danger to detainees, but they allowed him to continue working in a position where he would be alone with detainees: Mitchell says that he complained several times of Meyer making harassing comments about his homosexuality, and he states that Meyer was disciplined for looking at pornography on a work computer. Mitchell says that he informally discussed his complaints with defendant Theiler,

22

and that one of his complaints was discussed with defendants Ourada, Westerhaus and Sunde (although he does not explain how he knows this).

The problem for Mitchell is that he does not provide evidence plausibly connecting the incidents of harassment with a threat of danger to him. Mitchell does not provide facts from which a reasonable jury could conclude that Theiler, Ourada, Westerhaus, or Sunde were aware that Mitchell faced a risk of *physical* harm from Meyer.  Their actions in response to Mitchell's complaints about harassment could not have been purposefully, knowingly, or recklessly directed at the risk to Mitchell's physical safety. At most, defendants knew that Meyer had made some disparaging remarks about Mitchell being gay or toward gay people in general, and they knew that at some point, Meyer had recommended that Mitchell be placed on shower-alone, bathroom-alone, hallway-alone, and staff-escort statuses. Mitchell suggests that Meyer tried to get Mitchell placed on isolating statuses so that it would be easier to assault him. But those isolating statuses are meant to keep detainees from engaging with sexual contact with each other; Mitchell doesn't show why defendants should have known or suspected that Meyer planned to use these statuses to facilitate an attack.

Mitchell has a similar problem with his allegation that Meyer was caught viewing pornography at work. Mitchell does not explain how he knows that this event happened.  But even if it did, Mitchell doesn't explain how this would lead defendants to believe that Meyer posed a risk of physical harm to Mitchell. Mitchell suggests that had defendants been better trained in PREA standards, they would have been better equipped to see warning signs for potential physical abuse. But Mitchell doesn't point to any evidence to support this idea.  I will grant summary judgment on Mitchell's claims based on defendants' failure to protect him from Meyer.

The second type of failure-to-protect claim that Mitchell brings is that the supervisory defendants either implemented or carried out policies that demonstrate little interest in stopping sexual assaults. Mitchell attempts to tie together all the various policies discussed above, contending that restrictions on phone calls, mail, law library access, and detainee grievance procedures squelched detainees' ability to contact the outside world about abuses at Lincoln Hills. He also contends that policies like shower and hallway restrictions and the red shirt program "effectuate[d] an environment that made it clear reporting homosexual behavior would not be tolerated." Dkt. 14, at 12. And he says that defendants did not ensure that there were enough cameras or staffing to ensure the detainees' safety.

But Mitchell still needs to show that defendants were aware of a substantial risk of serious harm given the conditions and policies at Lincoln Hills. A generalized or theoretical risk of violence is not enough. Mitchell doesn't show that defendants should have known about the risk of harm from Meyer, and he doesn't present facts showing that any other particular detainees or staff were threats to him, or that in the aggregate sexual assault was a rampant problem at Lincoln Hills. The facts about the number of surveillance cameras and number of staff members on duty show only a theoretical risk of harm: a detainee *could* have been assaulted out of camera range or because of a lack of adequate staffing. Mitchell says that staff could have blocked or confiscated any attempt at mail or phone calls complaining about abuse at Lincoln Hills, but he doesn't provide any examples of this happening, much less that defendants were aware of it. He says defendants made grievance materials impossible to obtain, but that's contradicted by his own series of 2010 grievances against Meyer. And Mitchell takes issue with various protective or security-based statuses like showering alone or the red shirt program, but those are examples of policies meant to *prevent* sexual contact between detainees.

24

Mitchell contends that his behavior showed that he was "crying out for help" and that defendants should have understood those signs of abuse and intervened. Dkt. 68, at 25, ¶ 238. He tries to support this by stating that defendants didn't receive proper PREA training, but five of the six defendants in fact completed that training. And Mitchell doesn't explain what about his behavior should have alerted defendants to him having been abused at Lincoln Hills.

I will grant summary judgment to defendants on these claims because Mitchell fails to provide evidence from which a reasonable jury could conclude that Lincoln Hills officials were aware of a substantial risk to Mitchell of sexual assault. Mitchell will proceed to trial on his sexual assault claims against defendant Meyer.

## ORDER

IT IS ORDERED that:

1. Plaintiff Shayd Charles Mitchell's motion to compel discovery, Dkt. 37, is DENIED.

2. Defendants' motion for summary judgment, Dkt. 51, is GRANTED in part and DENIED in part.

3. Defendants Bye, Ourada, Sunde, Theiler, and Westerhaus are DISMISSED from the case.

4. The clerk of court is directed to set a scheduling conference with Magistrate Judge Stephen Crocker to set a new trial date for plaintiff's claims against defendant Meyer.

Entered September 29, 2020.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge